**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AL RAGO, derivatively on behalf of TINGO GROUP, INC. | |
| Plaintiff, | Case No.: _____ |
| vs. | |
| DARREN MERCER, HAO CHEN, DOZY MMOBUOSI, ROBERT BENTON, JOHN J. BROWN, KENNETH DENOS, JOHN MCMILLAN SCOTT, and SIR DAVID TRIPPIER, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| TINGO GROUP, INC., f/k/a MICT, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Al Rago ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Tingo Group, Inc., f/k/a/ MICT, Inc. ("Tingo" or the "Company"), files this Verified Shareholder Derivative Complaint against Darren Mercer ("Mercer"), Hao "Kevin" Chen ("Chen"), Dozy Mmobuosi ("Mmobuosi"), Robert Benton ("Benton"), John J. Brown ("Brown"), Kenneth Denos ("Denos"), John McMillan Scott ("Scott"), and Sir David Trippier ("Trippier") (collectively, the "Individual Defendants," and together with Tingo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Tingo, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's

complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tingo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tingo's directors and officers from December 1, 2022 through June 6, 2023, inclusive (the "Relevant Period").

2.      Tingo is a holding company incorporated in Delaware with principal executive offices in New Jersey that owns subsidiaries and entities that operate in financial technology ("fintech") and agricultural financial technology ("agri-fintech") industries. Prior to a merger in December 2022 and a rebranding in February 2023, Tingo was known as MICT, Inc. In December 2022, the Company merged with Tingo, Inc. ("TMNA"). In the merger, the Company purchased from TMNA the entire operations of Tingo Mobile Limited ("Tingo Mobile") and, subsequently in February 2023, Tingo Foods PLC ("Tingo Foods").

3.      By way of the Company's structure, Tingo Mobile and Tingo Foods are held under the Company's subsidiary Tingo Group Holdings LLC ("TGH"), an agri-fintech company that operates in Africa. Tingo Mobile is an agri-fintech company focused on providing rural farming

communities with communication devices. Tingo Mobile's mission focuses on offering Nigerian farmers with an e-commerce marketplace, a point-of-sale app, and a credit card.

4.     Meanwhile, Tingo Foods is an upcoming food processing project in the delta region of Nigeria. Tingo Foods is said to be developing a $1.6 billion "Special Agriculture Processing Zone" to provide sustainable food production in Nigeria.

5.     Following the merger, several of the Individual Defendants solicited shareholders to vote on various proposals in the Schedule 14(a) the Company filed with the SEC on December 8, 2022 (the "2022 Proxy Statement"), which contained materially false and misleading statements and omissions. The 2022 Proxy Statement called for shareholders to, *inter alia*: (1) elect five directors to serve on the Company's Board of Directors (the "Board") until the 2023 annual meeting of stockholders or until their successors are elected and qualified; and (2) to approve an amendment to the 2020 Equity Incentive Plan of MICT (the "Plan") to increase the number of shares of common stock authorized to be issued pursuant to the Plan from 20,000,000 to 25,000,000. As a result of the Individual Defendants' false and misleading statements, shareholders approved the proposal related to the Plan, thereby enabling the Individual Defendants and others at the Company to materially benefit, unjustly, therefrom in the future. The matters omitted from the 2022 Proxy Statement were significant to investors, who were aware of the Company's claims that the new merger and the Tingo subsidiaries would drastically improve the Company's financial standing. Had shareholders been aware of the true state at the Company, they would not have voted to approve the proposal related to the Plan.

6.     During the Relevant Period, the Company continued to represent to shareholders the drastic boost that both Tingo Food and Tingo Mobile provided to the Company's financial profile.

7.     However, on June 6, 2023, Hindenburg Research ("Hindenburg"), a famous short seller, published a report titled "Tingo Group: Fake Farmers, Phones, and Financials---The Nigerian Empire That Isn't" (the "Hindenburg Report"). Along with exposing the operational and financial fraud of Tingo, the Hindenburg Report exposed Defendant Mmobuosi, the founder and Chief Executive Officer ("CEO") of Tingo Mobile and Tingo Foods, for reportedly fabricating parts of his biography.

8.     The Hindenburg Report revealed that Tingo made several false claims and misrepresentations about its businesses and financial reports. One example provided by Hindenburg was that "Tingo had photoshopped its logo onto pictures of airplanes" and that "Dozy later admitted to never owning any actual aircraft." Likewise, the Hindenburg Report pointed out that while Tingo's food division claimed to have a 24.8% operating margin, this claim "exceeds [the operating margin] of every major comparable food company." Moreover, a purported rendering of Tingo's planned $1.6 billion food processing facility in Lagos, Nigeria that was featured in Tingo's materials to investors and on a billboard, was a rendering of an oil refinery taken from a stock photo website. Tingo had made representations of "significant progress" on the facility, yet when Hindenburg researchers visited the site just "a week later," they found "zero signs of progress."

9.     The Hindenburg Report further revealed inconsistencies in Tingo's financial reporting for the first quarter ended March 31, 2023, where food inventory disappeared without any comment or explanation from the Company. Additionally, two of the farming cooperatives that Tingo alleged made up the majority of Tingo Mobile's 9.3 million users claimed that they had never even heard of Tingo. Hindenburg also revealed that Tingo's purported license that generated $128 million in revenue for leasing handsets, call, and data in Q1 2023, did not exist until June

2023. The Hindenburg Report also demonstrated that Tingo Mobile's office in Lagos, Nigeria, had a tax delinquency sign posted on it by federal tax authorities in Nigeria. In further perpetuating its scheme, Tingo had photoshopped its logo onto a point-of-sale system diagram taken from a competitor's website. Regarding Nwassa, the Hindenburg Report revealed that the Nwassa website had been out of order and inoperable for months, even as the Company claimed it generated $125.3 million in revenue. Additionally, Hindenburg found no evidence from Nigeria's import/export records that supported Tingo's claim that its brand-new agricultural export business was on track to deliver by Q3 2023 over $1.34 billion in exports.

10.     The Hindenburg Report also revealed that Tingo failed to implement effective controls over its accounting and financial reporting. For example, Tingo had committed basic accounting errors such as incorrect math and dropping zeroes off essential metrics. The Hindenburg Report further revealed critical accounting errors, such as Tingo's cash flow and balance sheet statements being incorrectly reported. For instance, the cash flow error would add items that should have been subtracted or subtract items that should have been added. The Hindenburg Report suggested that these errors were also applicable to Tingo's audited annual financial statements.

11.     On this news, Tingo's stock price fell from a closing price of $2.55 per share on June 5, 2023, to a closing price of $1.32 per share on June 6, 2023. This demonstrates a fall of $1.23 per share, or a 48.2% decrease.

12.     Throughout the Relevant Period, the Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Tingo's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had

fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; and (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative

action, of the officers' and directors' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New Jersey or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received

substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Tingo. Plaintiff has continuously held Tingo common stock since the time of the alleged wrongdoing.

24.     Upon information and belief, Plaintiff is a citizen of Tennessee.

### Nominal Defendant Tingo

25.     Tingo is a Delaware corporation with principal executive offices at 28 West Grand Avenue, Suite 3, Montvale, New Jersey 07645. Tingo's common stock trades on the Nasdaq under the symbol "TIO."

### Defendant Mercer

26.     Defendant Mercer served as a Company director beginning November 2019 and as the Company's CEO beginning April 2020 until he resigned from both positions on September 15, 2023. According to the Form 10-K the Company filed with the SEC on March 31, 2023 (the "2022 Form 10-K"), as of March 31, 2023, Defendant Mercer beneficially owned 15,620,939 shares of Tingo common stock, representing 9.5% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Mercer owned approximately $16.4 million worth of Tingo stock as of that date.

27.      For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Mercer received $4,174,837 in total compensation from the Company. This included $800,000 in

salary, $999,875 in bonus, $2,145,600 in stock based awards, and $229,362 in all other compensation.

28.     The 2023 Proxy Statement stated the following about Defendant Mercer:

**Darren Mercer.**   Darren Mercer has served on our Board since November 2019 and was appointed as our Interim Chief Executive Officer in April 2020, and subsequently, our Chief Executive Officer. Mr. Mercer began his career as an investment banker in the 1980s, holding senior roles in institutional equity sales and corporate brokering at Henry Cooke Lumsden PLC and Albert E. Sharp LLC. In 2007, Mr. Mercer founded BNN and has served as its Chief Executive Officer since from its inception to October 2017. In February 2018, Mr. Mercer accepted an invitation to serve as an executive director from the newly appointed board of directors of BNN. During his tenure, Mr. Mercer restructured BNN by disposing of various subsidiaries and seeking strategic business partners. Mr. Mercer founded Global Fintech and Global Fintech Holdings Ltd. ("GFH") in October 2018 and November 2019, respectively and has served as director of both companies since their inception, and as a Director of Strategic Partnerships and Business Development and Executive Director since 2017. Since Mr. Mercer joined the TINGO GROUP Board, he helped TINGO GROUP achieve substantial fund raising and introduced significant new business opportunities to TINGO GROUP. Mr. Mercer holds an MSI (DIP) qualification a BASc in Economics from the University of Manchester. We believe that Mr. Mercer is well-qualified to serve on the TINGO GROUP Board due to his extensive financial services, operational, management and investment experience.

29.     Upon information and belief, Defendant Mercer is a citizen of the United Kingdom.

**<u>Defendant Chen</u>**

30.     Defendant Chen has served as the Company's Chief Financial Officer ("CFO") since November 2021. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Chen beneficially owned 300,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Chen owned approximately $315,000 worth of Tingo stock as of that date.

31.     For the 2022 Fiscal Year, Defendant Chen received $269,640 in total compensation from the Company. This included $216,000 in salary and $53,640 in stock based awards.

32.     The 2023 Proxy Statement stated the following about Defendant Chen:

**Hao (Kevin) Chen.**   Mr. Chen was promoted by the Board to serve as the Chief Financial Officer of the Company in November 2021. He has more than 13 years of experience providing financial services to a variety of public and private companies, including in the role as Chief Financial Officer. He has a demonstrated history of working within the technology industry and is skilled in US GAAP accounting, SOX internal controls, debt and equity financing and strategic management. Mr. Chen previously served as the Chief Financial Officer and board member of China Rapid Finance (NYSE:XRF), a holding company operating primarily in the emergency rescues services business, which utilizes cloud and other cutting-edge technologies to provide emergency rescue services, including an app based mobile platform, cloud call centers and large data centers. Prior to that, Mr. Chen served as a Senior Financial Reporting Manager to Qunar.com (China's online travel platform NASDAQ:QUNR) from 2013 to 2015 and served as an Audit Manager with Ernst & Young from 2008 to 2013. Mr. Chen holds a Master of Business Administration from Kellogg School of Management at Northwestern University, a Master of Economics from Shanghai University of Finance and Economics and a Bachelor of Mathematics from Shandong University. He is a Certified Public Accountant in the U.S.

33.    Upon information and belief, Defendant Chen is a citizen of New York.

**Defendant Mmobuosi**

34.    Defendant Mmobuosi has served as interim co-CEO of the Company since September 19, 2023. Defendant Mmobuosi is also the CEO of TGH, a wholly owned subsidiary of the Company, and the founder of Tingo Mobile and Tingo Foods.

35.    Tingo's website states the following about Defendant Mmobuosi:

Dozy Mmobuosi is a technology entrepreneur, philanthropist and ardent campaigner for social and technological advancement in Africa. Dozy is the Founder of Tingo Foods and Tingo Mobile, which has become one of Africa's leading agri-fintech, fintech and food companies over the past 23 years. Tingo is helping to deliver financial inclusion to millions of farmers, SMEs, women-led businesses and consumers in Africa.

In 2002 Dozy designed Nigeria's first text based money transfer platform. Dozy has also acted as an advisor to several large corporations and has extensive business experience in Sub-Saharan Africa, China, South East Asia, United Arab Emirates, Bulgaria, the United States of America and the United Kingdom.

Global challenges such as climate change, food security and social upliftment are a key focus of Dozy's philanthropic ventures and in December 2021 he launched the Dozy Mmobuosi Foundation. The Foundation's mission is to promote the progress of Africa, and Mmobuosi has pledged to donate 10% of his net worth to the cause. Dozy's significant contributions to technology and social betterment in Africa have earned him a place on the New African 100 Most Influential Africans of 2022 list.

Dozy holds a BSc in Political Science, and an MSc in Economics from Ambrose Alli University in Nigeria, along with a number of honorary degrees. In 2022, he completed the Advanced Management & Leadership Programme at Saïd Business School, University of Oxford.

36.     Upon information and belief, Defendant Mmobuosi is a citizen of Nigeria.

**Defendant Benton**

37.     Defendant Benton served as a Company director from April 2021 until he resigned on September 18, 2023. Prior to his resignation, Defendant Benton served as Chairman of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Benton beneficially owned 160,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Benton owned approximately $168,000 worth of Tingo stock as of that date.

38.     For the 2022 Fiscal Year, Defendant Benton received $93,981 in total compensation from the Company. This included $45,000 in fees earned or paid in cash, $27,525 in option awards, and $21,456 in stock awards.

39.     The 2023 Proxy Statement stated the following about Defendant Benton:

**Robert Benton.**   Mr. Benton has served on the Board of TINGO GROUP since April 2021. He has been the Director and Founder of Anthology Media, Ltd, (formerly Bob & Co, Ltd) where he provides integrated strategies designed to bridge the gap between creativity and finance for TV and film production companies since August 2010. Prior to his employment at Anthology Media, Ltd, Mr. Benton was a Managing Director and Head of Media Investments at Canaccord Adams Ltd., from September 2008 to June 2010, where he focused on marketing, sales, and corporate finance. Mr. Benton was also a Managing Director at Ingenious Media, an investment company specializing in the media, infrastructure, real estate and education sectors from August 2006 to May 2008. Prior to his employment at Canaccord Adams Ltd and Ingenious Media, Mr. Benton was employed as the Chief Executive Officer at Bridgewell Securities Ltd, a United Kingdom investment banking firm, from January 2002 to June 2006. From 1997 to 2001, Mr. Benton served as a Chairman and Chief Executive Officer for Charterhouse Securities Limited. Mr. Benton also served as the Global Head of Sales for ABN-

ABRO from June 1994 to June 1997. Prior to that, Mr. Benton was a Managing Director of HSBC James Capel Ltd, from November 1992 to June 1995. Mr. Benton currently serves as the Deputy Chair of Everbright Securities Financial Holding Limited, which engages in the provision of financial brokerage services. He also sits on the board of directors for International Literacy Properties, a company that works with authors, managers of literary estates and individual heirs to help realize the value from book-based intellectual property. Mr. Benton has served on the board of The Discerning Eye, a United Kingdom based educational charity that promotes a wider understanding and appreciation of the visual arts and further stimulates debate about the place and purpose of art in our society through its annual exhibition. Mr. Benton sits on the Advisory Committee for Nash & Co Capital, Ltd, which is an independent corporate finance and advisory company. Previously, Mr. Benton served as the Chairman of Clarkson Plc, the FTSE 250 shipping group, from May 2005 to January 2015. Mr. Benton holds a degree in Politics and Economics from Exeter University. We believe Mr. Benton is well qualified to serve as a director due to his extensive leadership experience.

40.     Upon information and belief, Defendant Benton is a citizen of New Jersey.

**Defendant Brown**

41.     Defendant Brown has served as a Company director since December 2022. He has also served as a director of TMNA, the previous parent company of Tingo Mobile, since September 2021. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Brown beneficially owned 45,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Brown owned approximately $47,250 worth of Tingo stock as of that date.

42.     The 2023 Proxy Statement stated the following about Defendant Brown:

**John J. Brown.**   John J. Brown has served on the board of directors of TMNA since September 2021. Since 2016, Mr. Brown has also been the Managing Partner of Sands Point Consulting, an advisor to entrepreneurs, founders, and senior corporate leaders to develop new business strategies for a rapidly changing market. From 2009 — 2016, he was the Group Managing Director and a member of the WMA Executive Committee for UBS Wealth Management Americas. From 1995-2000, Mr. Brown was the Managing Director and Global Head of Convertible Securities Trading at UBS, and from 1980-1995 and again from 2000-2009 he was a Managing Director for Merrill Lynch & Co., holding senior executive leadership positions at Merrill Lynch, most notably COO, Operations, Technology & Corp. Services Group. At Merrill Lynch, Mr. Brown managed a $1 billion annual

operating budget. He also served as the Head of US Equity Financing & CEO, Merrill Lynch Professional Clearing Corp in its Prime Broker Division. We believe Mr. Brown is well qualified to sit on our board due to his extensive experience at various positions at UBS and Merrill Lynch, as well, as his experience in developing new business strategies.

43.     Upon information and belief, Defendant Brown is a citizen of New York.

**Defendant Denos**

44.     Defendant Denos has served as interim co-CEO of the Company since September 18, 2023 and as a Company director since November 2022. Defendant Denos has also served as the Executive Vice President, General Counsel, and Corporate Secretary of TMNA, the previous parent company of Tingo Mobile, since September 2021. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Denos beneficially owned 45,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Denos owned approximately $47,250 worth of Tingo stock as of that date.

45.     The 2023 Proxy Statement stated the following about Defendant Denos:

**Kenneth Denos.**   Kenneth Denos has served as TMNA's Executive Vice President, General Counsel, and Corporate Secretary since September 2021. Since June 2005, Mr. Denos has been an officer and director of Equus Total Return, Inc. (NYSE: EQS), a closed-end fund traded on the New York Stock Exchange, serving as its President and CEO from 2007-09. He is also a founder and principal of Outsize Capital Ltd., an international corporate finance advisory firm based in London, and is the founder and Chairman of Kenneth I. Denos, P.C., a U.S.-based corporate and consumer law firm. Previously, Mr. Denos was the CEO of MCC Global NV, a Frankfurt stock exchange listed investment advisory firm based in London, and also served as a director and executive officer of two London Stock Exchange listed firms, Healthcare Enterprise Group plc and Tersus Energy plc. Mr. Denos has worked in the private equity and advisory industry for virtually his entire career, having served as a principal and/or advisor to private and public companies and funds in the Middle East, Europe, Africa, and North America. He holds a Bachelor of Science degree in Business Finance and Political Science from the University of Utah. He also holds a Master of Business Administration and a Juris Doctor from the University of Utah. We believe that Mr. Denos is well-qualified to serve on the board due to his extensive international legal and corporate

governance background, as well as his financial services and investment experience.

46.     Upon information and belief, Defendant Denos is a citizen of Utah.

**Defendant Scott**

47.     Defendant Scott has served as a Company director since November 2019 and as the Chairman of the Board since September 19, 2023. He also serves as Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Scott beneficially owned 530,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Scott owned approximately $556,500 worth of Tingo stock as of that date.

48.     For the 2022 Fiscal Year, Defendant Scott received $217,664 in total compensation from the Company. This included $55,000 in fees earned or paid in cash, $55,050 in option awards, $107,280 in stock awards, and $334 in all other compensation.

49.     The 2023 Proxy Statement stated the following about Defendant Scott:

**John McMillan Scott.**   John McMillan Scott has served on our Board since November 2019. Mr. Scott began his career as a stockbroker in October 1970 with Charlton Seal Dimmock & Co. He became a Partner at the same firm in 1982 and subsequently a Director of Wise Speke Limited following a merger in 1990. In August 1994, he joined Albert E. Sharp LLP as a Director, where he remained until June 2007. In 2007, he joined WH Ireland Group Plc, a financial services company offering private wealth management, wealth planning and corporate broking services, where he oversaw the firm's private client business in Manchester, U.K. until his retirement from his role as an Executive Director from WH Ireland's Board of Directors in 2013. Mr. Scott holds a BSc in Economics from the University of London. We believe that Mr. Scott is qualified to serve on our Board because of his accounting expertise and his experience serving as an officer and director of public and private companies.

50.     Upon information and belief, Defendant Scott is a citizen of the United Kingdom.

**Defendant Trippier**

51.     Defendant Trippier has served as a Company director since May 17, 2022. Defendant Trippier also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Trippier beneficially owned 100,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Trippier owned approximately $105,000 worth of Tingo stock as of that date.

52.     For the 2022 Fiscal Year, Defendant Trippier received $50,206 in total compensation from the Company. This included $28,750 in fees earned or paid in cash and $21,456 in stock awards.

53.     The 2023 Proxy Statement stated the following about Defendant Trippier:

**Sir David Trippier, R.D.,J.P.,D.L.**   Until April 2011 Sir David Trippier was the Chairman of Cambridge shire Horizons, the company delivering sustainable development in the Cambridge Sub-region, and he was the Chairman of W H Ireland Group plc, Stockbrokers until May 2008 when the company was taken over by a consortium. He was until recently a Non-Executive Director of ITV Granada Television and has been a director or Chairman of several quoted companies. Sir David was knighted by the Queen in July 1992 when he was 46 years of age. In 1994 he was appointed by the Council of the Stock Exchange to sit on the committee, which formulated and launched the Alternative Investment Market (AIM) in June 1995. Since 1992, he has been Chairman or main Board Director of three companies, which have floated on the Stock Exchange and are now in the Main List, and one that has floated on the AIM Market. He was born in May 1946, educated at Bury Grammar School and later was commissioned as an officer in the Royal Marines Reserve in which he has served for 30 years. He passed the Commando Course at the Commando Training Centre in Devon in 1969 and the following year qualified as a parachutist at RAF Abingdon. He subsequently qualified as a Company Commander at the School of Infantry at Warminster and later passed the Staff College Course at the Royal Naval College at Greenwich. He has served with 40 Commando Royal Marines in Singapore and Malaysia, 41 Commando in Malta and the 3rd Commando Brigade in Norway. He was awarded the Royal Marines Reserve Decoration in 1983. In January 1996, he was appointed Honorary Colonel of the Royal Marines Reserve in the Northwest by the Commandant General Royal Marines. He retired from that role in January 2010. At the age of 22, he was admitted to the Stock Exchange. He was also a director of a

financial planning company as well as being a Stockbroker. He was a senior partner in Pilling Trippier & Co before it was taken over by Capel-Cure Myers whilst he was a Minister. He was elected to the Rochdale Metropolitan Borough Council in 1969. In 1975, he became the leader of the Council when he was 28 years of age and in the same year was appointed a magistrate. In 1979, he was elected as MP for Rosendale at the age of 32 and became MP for the new constituency of Rosendale and Darwen from 1983 to 1992. In 1982, Sir David was appointed Parliamentary Private Secretary to the then Minister for Health (Rt Hon Kenneth Clarke QC, MP). From June 1983 to September 1985, Sir David was the Minister for Small Firms and Enterprise at the Department of Trade and Industry. From September 1985 to June 1987, he was the Minister for Tourism, Small Firms and Enterprise in the Department of Employment. In 1987 he became the Minister for Housing, Inner Cities and Construction in the Department of the Environment. Later in 1989, he was promoted to become the Minister of State for the Environment and Countryside. As the "Green" Minister he was instrumental in negotiating the international agreements on Climate Change and Global Warming on behalf of the United Kingdom. In February 1994, he became a Deputy Lieutenant of Lancashire. In April 1997, he became High Sheriff of Lancashire for the year 1997/98. In 1999, he published his autobiography entitled "Lend Me Your Ears". He became the President of the Manchester Chamber of Commerce for the year 1999-2000. He was the National Chairman of the Tidy Britain Group from 1996 to 1998. He became the President of the Royal Lancashire Show for the year 1999. Sir David became the Chairman of the North West of England Reserve Forces and Cadets Association from 2000 to 2008. He was the National Vice Chairman of the Council of Reserve Forces from 1999 to 2008 representing the Royal Marines. He served as the County Chairman for the St. John Ambulance in Lancashire from 2003 to 2007. He was the County President of the Royal British Legion in Lancashire from 2005 to 2008.He was the founder of the Rosendale Enterprise Trust and the Rosendale Groundwork Trust. He is the President Elect of the Soldiers, Sailors, Airmen and Families Association — Forces Help for Greater Manchester. In November 2006, Sir David won a National Award for "Outstanding Leadership" sponsored by the Daily Telegraph. He was nominated as one of 100 of Britain's most influential men and women in the Public and Private Sectors. He is married and has three sons. His wife, Lady Ruth Trippier, is a practicing barrister on the Northern Circuit. We believe that Sir David Trippier is qualified to serve on our Board because of his experience in launching the AIM and his experience as serving as chairman or a director of multiple listed companies.

54.     Upon information and belief, Defendant Trippier is a citizen of the United Kingdom.

**Relevant Non-Party**

**Jamal Khurshid**

55. On September 18, 2023, the Company announced it was appointing Jamal Khurshid ("Khurshid") to serve as a director on the Company's Board. Khurshid replaces Defendant Benton's position on the Board following Defendant Benton's retirement.

56. The Company's website states the following about Khurshid:

Jamie Khurshid served as an investment banker for over 20 years at Goldman Sachs, Credit Suisse and Royal Bank of Scotland before joining Cinnober Financial Technology, the world's leading independent exchange and clearing house technology provider, as a senior partner where Mr. Khurshid served from 2013 to 2018. In 2018, Mr. Khurshid co-founded Digital RFQ, a leading digital payments service. From 2020 through 2021, Mr. Khurshid served as the COO of Droit Financial Technology, an enterprise technology firm. Since 2021, Mr. Khurshid joined Financial Strategies Acquisition Corp in June 2021 as Chief Executive Officer, subsequently resigning from the position in January 2022 remaining a director of the company. In September 2021 he co-founded, and is a director and Chairman of Jacobi Asset Management Holdings Limited in the United Kingdom and parent company of Jacobi Asset Management PCC Limited, an ETF issuer in Guernsey. In November 2021 he was appointed as Chief Operating Officer and Director of Caduceus Foundation, a blockchain technology company in Singapore. He is a Board member of 4Phyll Private Limited, a BioPlastics technology company in Singapore and Non-Executive Director for OneCycle Group, a chemical engineering technology provider in the UK. In 1997, Mr. Khurshid graduated from the University of Reading in the United Kingdom with second class honours as a Bachelor of Science in Environmental Science. Mr. Khurshid was voted by financial news as one of the top 40 under 40 in European trading and technology (2014) and ranked in the 'Exchange invest' Top 1000 most influential people in global financial markets in 2017.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57. By reason of their positions as officers, directors, and/or fiduciaries of Tingo and because of their ability to control the business and corporate affairs of Tingo, the Individual Defendants owed Tingo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tingo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tingo and its shareholders so as to benefit all shareholders equally.

58.     Each director and officer of the Company owes to Tingo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tingo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60.     To discharge their duties, the officers and directors of Tingo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tingo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Tingo's Board at all relevant times.

62.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

63.     To discharge their duties, the officers and directors of Tingo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tingo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Tingo's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tingo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tingo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tingo's operations would comply with all applicable laws and Tingo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64.     Each of the Individual Defendants further owed to Tingo and the shareholders the duty of loyalty requiring that each favor Tingo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Tingo and were at all times acting within the course and scope of such agency.

66.     Because of their advisory, executive, managerial, directorial, and controlling positions with Tingo, each of the Individual Defendants had access to adverse, non-public information about the Company.

67.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tingo.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

70.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Tingo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tingo and was at all times acting within the course and scope of such agency.

## TINGO'S CODE OF CONDUCT

73.     Tingo's Code of Conduct provides Company employees with "general guidelines for conducting the business of [Tingo] consistent with the highest standards of business ethics." The Code of Conduct states that "[e]ach employee and director is expected to read and understand this Code, uphold these standards in day-to-day activities and comply with all applicable policies and procedures."

74.     In a section titled "COMPANY RECORDS," the Code of Conduct states the following:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and other disclosures to the public and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business.

22

All Company records must be complete, accurate and reliable in all material respects. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy.

75.     In a section titled "ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS," the Code of Conduct states the following:

As a public company, we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

76.     In a section titled "COMPLIANCE WITH LAWS AND REGULATIONS," the Code of Conduct states the following, in relevant part:

Each employee has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

77.     In a section titled "Reporting Violations of the Code," the Code of Conduct states the following:

All employees have a duty to report any known or suspected violation of this Code, including any violation of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor or a member of the Governance Committee, who will work with you and your supervisor to investigate your concern. If you do not

feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact a member of the Governance Committee directly. A sufficiently detailed description of the factual basis for the allegations should be given in order to allow for an appropriate investigation. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion Your supervisor, the Governance Committee and the Company will protect your confidentiality to the extent possible, consistent with applicable law and the Company's need to investigate your concern.

It is the Company policy that any employee who violates this Code will be subject to appropriate discipline, which may include termination of employment. This determination will be based upon the facts and circumstances of each particular situation. An employee accused of violating this Code will be given an opportunity to present his or her version of the events at issue prior to any determination of appropriate discipline. Employees who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community. Your conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both you and the Company.

78.     In a section titled "CONFLICTS OF INTEREST," the Code of Conduct states the following, in relevant part:

A conflict of interest can occur when an employee's private interest interferes, or appears to interfere, with the interests of the Company as a whole. You should avoid any private interest that influences your ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively.

***

The Company requires that employees disclose any situations that reasonably would be expected to give rise to a conflict of interest. If you suspect that you have a conflict of interest, or something that others could reasonably perceive as a conflict of interest, you must report it to your supervisor or a member of the Governance Committee. Your supervisor or a member of the Governance Committee will work with you to determine whether you have a conflict of interest and, if so, how best to address it. Although conflicts of interest are not automatically prohibited, they are not desirable and may only be waived as described in "Waivers of the Code" above.

79.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

80.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following, in relevant part:

> The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") to provide assistance to the Board in fulfilling its oversight responsibility to the stockholders, potential stockholders, the investment community, and others relating to the Company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the annual independent audit of the Company's financial statements, and the legal compliance and ethics programs as established by management and the Board. The committee shall also monitor the qualifications and independence of the independent auditors and the internal auditor, as well as their overall performance. In so doing, it is the responsibility of the Committee to maintain free and open communication among the Committee, the independent auditors, and management of the Company in discharging its oversight role. The Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company and the power to retain outside counsel or other experts for this purpose.

81.     Under a section titled "Committee Authority and Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The primary responsibility of the Committee is to oversee the Company's financial reporting process on behalf of the Board and report the results of their activities to the Board. Management is responsible for preparing the Company's financial statements, and the independent auditors are responsible for auditing those financial statements. The Committee in carrying out its responsibilities believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

82.     Under a section titled "Review of Financial Statements," the Audit Committee

Charter states that the Audit Committee is responsible for the following:

13. Reviewing with management and the independent auditors, the financial statements to be included in the Company's annual and quarterly reports, including their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements;

14. Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulation S-K, as amended, and Item 7(d)(3) of Schedule 14A, as amended;

15. Discussing the results of the annual audit, quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards;

83.     Under a section titled "Controls and Procedures," the Audit Committee Charter

states that the Audit Committee is tasked with, *inter alia*:

20. Establishing procedures to receive and respond, on a confidential basis, to concerns (anonymously reported or otherwise) regarding questionable accounting for auditing matters, or complaints (from employees and others) regarding the Company's account, internal accounting controls and audit matters;

21. Reviewing and approving all related-party transactions as defined under Item 404 of Regulation S-K, after reviewing each such transaction for potential conflicts of interests and other improprieties;

22. Consulting with and retaining legal, accounting and other advisers in connection with the performance of its duties and responsibilities;

23. Funding compensation to any independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the listed issuer;

24. Funding ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties and compensation to any advisers employed by the Committee;

25. Performing such other duties as may be requested by the Board, or as the Committee shall deem appropriate.

26

84.     In violation of the Audit Committee Charter, Defendants Benton, Scott, and Trippier failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

85.     Tingo is a Delaware corporation that was founded in 2002 with headquarters in Montvale, NJ. Prior to December 2022, Tingo was known as MICT, Inc. The Company rebranded as Tingo Group, Inc. following the acquisition of Tingo Mobile in 2022 and Tingo Food in 2023. Prior to the acquisition of the agri-fintech companies discussed herein, Tingo had operated an insurance brokerage business trying to break into markets in China.

86.     Before rebranding, the Company was struggling to find a market as MICT, Inc. Indeed, the Company reported net losses of $23,636,000 in 2020. Those net losses ballooned to over $37 million in 2021. To improve its financial positioning, the Company looked for a merger partner, which it found with TMNA, and its founder, Defendant Mmobuosi, in late 2022. TMNA operated in Africa as an agri-fintech company. It included two key subsidiaries: Tingo Mobile and Tingo Foods. On October 7, 2022, Tingo announced that it had entered into a merger agreement to acquire 100% of the operating business and assets of TMNA, including Tingo Mobile. The Company closed the transaction on December 1, 2022. In a press release announcing the merger, Defendant Mercer emphasized that the "***completion of this acquisition markedly strengthens our balance sheet and makes us immediately significantly profitable***. We therefore expect to report substantial earnings for Q4 2022, followed by material quarter over quarter growth in both revenues and profitability in 2023 and beyond." (Emphasis added.)

87.     On February 9, 2023, the Company acquired the remaining outstanding shares of Tingo Foods directly from Defendant Mmobuosi. Pursuant to the transaction, the Company issued to Defendant Mmobuosi a secured, promissory note of $204 million.

88.     The Company announced on February 24, 2023 that it would be changing its name from MICT, Inc. to Tingo Group, Inc. in addition to changing its ticker symbol to "TIO."

89.     Since rebranding, the operations of Defendant Mmobuosi's businesses have taken the forefront of Tingo's priority, with most of the Company's operations occurring in Nigeria. The newly acquired Tingo Foods purports to be a profitable food processing business which processes raw ingredients into finished products such as rice and pasta. Tingo Foods' mission is to "make Africa's food production self-sufficient and sustainable, by putting farmers at the heart of our story." Following the purchase of Tingo Foods, Tingo announced in early 2023 that it had plans to construct a $1.6 billion food processing facility in Nigeria. The Company even claimed it had begun breaking ground and held a ceremony.

90.     Defendant Mmobuosi was the CEO of Tingo Group Holdings, which is a wholly owned subsidiary of Tingo.  Moreover, Tingo Mobile is a wholly owned subsidiary of Tingo Group Holdings. Tingo's public filings described Tingo Mobile as "the leading Agri-Fintech Company operating in Africa, with a comprehensive portfolio of innovative products, including a 'device as a service' smartphone and pre-loaded platform product." Tingo also represents that Tingo Mobile has 9.3 million subscribers. The Nwassa platform is a core product offering of Tingo Mobile. Nwassa is described as a "digital agricultural ecosystem" that enables farmers to sell their goods online directly to consumers.

91.     Another product that Tingo Group Holdings operates is the TingoPay Super App ("TingoPay"). The Company claims it operates TingoPay in a partnership with Visa.  As part of

the partnership, the Company states that customers can apply for a Tingo Visa card and use it via TingoPay for online transactions. So far, the service is not in full operation.

92.     In the days following the February acquisition, Tingo Group Holdings launched Tingo DMCC, which is a trading platform and export business for global commodities. According to Tingo, Tingo DMCC will facilitate the export and import of agricultural products between existing and new customers. According to Tingo DMCC's website, the company "connects buyers and farmers around the world and provides them with tools, technology, and intelligence to fairly trade with each other while saving cost, increasing profit, and providing affordable prices for end users." On May 30, 2023, the Company announced that Tingo DMCC' first export sales were $348 million.

93.     Unfortunately, the truth was revealed in the Hindenburg Report that Defendant Mmobuosi's businesses were empty shells. As the Hindenburg Report explains, the Company had vastly overstated the operations and revenue of each subsidiary. Instead of owning up to their poor purchase, however, Defendants have elected to paint the acquisition of Defendant Mmobuosi's businesses as a new era of success for the Company. As detailed in the following section, the Defendants made a series of false and misleading statements during the Relevant Period that depicted Tingo's subsidiaries as resounding successes, when in reality the subsidiaries' operations and revenues had been fabricated.

**False and Misleading Statements**

***December 1, 2022 Press Release***

94.     On December 1, 2022, the Company closed on its acquisition of TMNA, effectively completing the merger. That day, the Company and TMNA issued a press release wherein Defendant Mercer stated the following, in relevant part:

We firmly believe we have acquired one of the world's most exciting agri-fintech and fintech businesses. ***As reported in Tingo's Q3 results, Tingo Mobile is already highly profitable and growing strongly. Within the past few weeks, Tingo Mobile has delivered a number of major trade deals, which not only are expected to result in a more than tripling of current customer numbers, but also marks the commencement of its global expansion.***

(Emphasis added.)

95.     The press release also quoted Defendant Mmobuosi as saying that "[t]oday's merger is enabling us to accelerate upon our ambitious global expansion strategy, ***which in turn is already beginning to dollarize our business, a trend that is expected to continue and grow throughout 2023 and beyond***." (Emphasis added.)

96.     The statements made in ¶¶ 94-95 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Tingo Mobile's profitability projections were based on the false representation that it had millions of subscribers; (2) the Company was fabricating its trade deals, as the supposed partners in those deals denied that any agreements existed; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Tingo Mobile had failed to deliver on trade deals and was not highly profitable. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2022 Proxy Statement*

97.     On December 8, 2022, the Company filed the 2022 Proxy Statement with the SEC. The 2022 Proxy Statement was solicited by Defendants Mercer, Benton, Scott, and Trippier pursuant to Section 14(a) of the Exchange Act and contained various false and misleading statements and omissions. The 2022 Proxy Statement called for shareholders to approve, *inter alia*,

the election of Defendants Mercer, Benton, Scott, and Trippier to the Board and a proposal to increase the number of Company shares eligible to be issued pursuant the Plan by 5,000,000 (the "Plan Proposal"). The misrepresentations and omissions set forth herein were material to shareholders in voting on electing Defendants Mercer, Benton, Scott, and Trippier to the Board and approving the Plan Proposal. Shareholders would not have approved the Plan Proposal or the election of Defendants Mercer, Benton, Scott, and Trippier to the Board had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

98.     The purpose of the Plan Proposal was to "continue to be able to attract, retain and motivate executive officers and other employees and certain consultants." The 2022 Proxy Statement further stated that "we believe that equity compensation aligns the interests of our management and other employees with the interests of our stockholders." The 2020 Proxy Statement also noted that "[w]e believe that option grants have been critical in attracting and retaining talented employees and officers, aligning their interests with those of stockholders, and focusing key employees on the long-term growth of our Company." Regarding the Plan Proposal, the 2022 Proxy Statement also stated the following, in relevant part:

> Upon stockholder approval, an additional 5,000,000 shares of common stock will be reserved for issuance under the 2020 Plan, which will enable us to continue to grant equity awards to our officers, employees and consultants at levels determined by the Board to be necessary to attract, retain and motivate the individuals who will be critical to our Company's success in achieving its business objectives and thereby creating greater value for all our stockholders.

99.     With respect to risk oversight, the 2022 Proxy Statement stated the following:

> The Board, including the Audit Committee and Compensation Committee, periodically reviews and assesses the significant risks to the Company. Our management is responsible for the Company's risk management process and the day-to-day supervision and mitigation of risks. These risks include strategic, operational, competitive, financial, legal and regulatory risks. Our Board leadership structure, together with the frequent interaction between our directors and management, assists in this effort. Communication between our Board and

management regarding long-term strategic planning and short-term operational practices include matters of material risk inherent in our business.

The Board plays an active role, as a whole and at the committee level in overseeing the management of the Company's risks. Each of our Board committees is focused on specific risks within their areas of responsibility, but the Board believes that the overall enterprise risk management process is more properly overseen by all of the members of the Board. The Audit Committee is responsible for overseeing the management of financial and accounting risks. The Compensation Committee is responsible for overseeing the management of risks relating to executive compensation plans and arrangements. While each committee is responsible for the evaluation and management of such risks, the entire Board is regularly informed through committee reports. The Board incorporates the insight provided by these reports into its overall risk management analysis.

The Board administers its risk oversight responsibilities through the Chief Executive Officer and the Chief Financial Officer, who, together with management representatives of the relevant functional areas review and assess the operations of the Company as well as operating management's identification, assessment and mitigation of the material risks affecting our operations.

100.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated the following:

We have adopted a Code of Business Conduct and Ethics that applies to our directors, executive officers and all of our employees. The Code of Business Conduct and Ethics is available on our website at www.mict-inc.com and we will provide, at no charge, persons with a written copy upon written request made to us.

101.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

102.    The 2022 Proxy Statement was also false and misleading because it failed to disclose that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

103.    As a result of Defendants Mercer, Benton, Scott, and Trippier causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, (1) to reelect Defendants Mercer, Benton, Scott, and Trippier to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) to approve the Plan Proposal, thereby authorizing 5,000,000 shares of the Company's common stock to be available for issuance to the Individual Defendants under the Plan.

### *March 31, 2023 Form 10-K*

104.    On March 31, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 Form 10-K"), which was signed by Defendants Mercer, Chen, Benton, Denos, Trippier, Scott, and Brown. The 2022 Form 10-K stated the following regarding the Company's growth plans for Tingo Foods:

> A key element of the growth plans for Tingo Foods is the development of its own food processing facility. ***To this end, through a joint venture, Tingo Foods has committed to build and operate a state-of-the-art $1.6 billion food processing facility in the Delta State of Nigeria, which is expected to be completed by the end***

*of the first half of 202*4 . . . . In line with its Environmental, Social and Governance ("ESG") commitments*, Tingo Foods has entered into a partnership with a third-party company in the UK, Evtec Energy Plc, who have committed to fund and build a $150 million net zero carbon emission solar plant, to provide a sustainable and low-cost energy source to power its multi-billion-dollar food processing facility.*

(Emphasis added.)

105.    The statements made in ¶ 104 above were materially false and misleading because: (1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) Tingo had not begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo was not attempting to build its so-called "state-of-the-art" food processing facility.

106.    Regarding Tingo Group's globalization strategy, the 2022 Form 10-K stated that "[a]s part of its globalization strategy, TGH and its wholly owned subsidiary, Tingo Mobile Limited ('Tingo Mobile'), have recently begun to expand internationally and entered into trade partnerships that are contracted to increase the number of subscribed farmers from 9.3 million in 2022 to more than 32 million[.]" The 2022 Form 10-K further noted that "[e]ach of TGH's current subscribers is a member of one of a small number of cooperatives with whom a subsidiary of TGH has a contractual relationship, which facilitates the distribution of Tingo-branded smartphones into the various rural communities of user farmers/agri-workers." The 2022 Form 10-K also emphasized that "*[a]s of December 31, 2022, Tingo Mobile had approximately 9.3 million subscribers using its mobile phones and Nwassa payment platform*." (Emphasis.)

107.    The 2022 Form 10-K also contained a discussion of a purported agreement between Tingo Mobile and Airtel, a mobile network provider operating out of Nigeria. In relevant part, the

2022 Form 10-K represented that "[t]hrough a Mobile Virtual Network agreement with Airtel, Tingo Mobile provides its customers in Nigeria with voice and data services."

108.    Regarding TGH's supply of mobile phones, the 2022 Form 10-K stated the following:

> In March 2020, Tingo Mobile entered into a mobile phone procurement contract with UGC Technologies Company Limited, with located in Shenze Town, China. In January 2022, Tingo Mobile entered into an agreement with Bullitt Mobile Limited, based in Reading, England, who are a supplier of branded cellular telephone products and accessories.
>                                          ***
> **UGC Technologies Company Limited and Bullitt Mobile Limited are the TGH Group's sole suppliers of mobile phones at present.**

(Emphasis added.)

109.    The statements made in ¶¶ 106-108 above were materially false and/or misleading because they failed to disclose that: (1) the farming cooperatives—Airtel, UGC Technologies Company Limited, and Bullitt Mobile Limited—that Tingo Mobile had claimed resulted in 9.3 million subscriptions had only resulted in a few hundred subscriptions, with many of the farming cooperatives denying having ever heard of or worked with Tingo; and (2) due to the foregoing, Tingo Mobile did not have 9.3 million subscribers and, as such, did not "expect[] 30 million by the end of 2023."

110.    The 2022 Form 10-K represented that Nwassa was "Africa's leading digital agriculture ecosystem." The 2022 Form 10-K further stated the following about how Nwassa operates:

> Tingo Mobile's Nwassa platform is believed to be Africa's leading digital agriculture ecosystem that empowers rural farmers and agri-businesses by using proprietary technology that enables users to access markets in which they operate. **Using Tingo Mobile's ecosystem, farmers can ship produce from farms throughout Nigeria. The ecosystem provides real-time pricing, straight from the farms, which eliminates middlemen**. The customers of Nwassa users pay for produce bought using available pricing on the platform.

111.    With respect to Nwassa, the 2022 Form 10-K also noted that "the platform processes approximately $1 billion USD in gross transaction value (GTV) on a monthly basis."

112.    The statements made in ¶¶ 110-111 above were materially false and/or misleading because they failed to disclose that the Nwassa platform does not function. Indeed, the Hindenburg Report revealed that Nwassa's website had been under maintenance for months. Similarly, Hindenburg looked at archives of the platform which show that the platform was never fully developed. Instead, it only listed a few products—none of which had any reviews or ratings. Thus, the revenue numbers are false and misleading because Nwassa being out of operation means that the platform could not have processed the transactions during the time those statements were made.

### *March 31, 2023 Press Release and Earnings Call*

113.    Also on March 31, 2023, the Company issued a press release titled "Fintech and Agri-Fintech Company, Tingo Group, Inc., Reports Full Year 2022 Financial Results" ("FY22 Press Release"). Regarding the Company's full year financials for the 2022 Fiscal Year, the FY22 Press Release stated the following, in relevant part:

> MONTVALE, N.J., March 31, 2023 (GLOBE NEWSWIRE) -- Tingo Group, Inc. (NASDAQ: TIO) ("Tingo" or the "Company") today announced its financial results for the fiscal year ended December 31, 2022.
>
> The acquisition of 100% of Tingo Mobile Limited ("Tingo Mobile"), which was completed on November 30, 2022, has resulted in the consolidation of its financial results into the Company from December 1, 2022. Today's earnings presentation and this press release also includes pro forma financial information for the full year ended December 31, 2022, with comparative pro forma financial information for the year ended December 31, 2021, so as to provide shareholders with a fuller understanding of the performance and growth of the acquisition and its expected impact on the Company.

114.    In a section titled "Financial Results," the FY22 Press Release stated the following:

- Tingo Group cash balances at December 31, 2022, amounted to $500.3 million, compared to $96.6 million at December 31, 2021.

- Net revenues of Tingo Group for 2022 (including Tingo Mobile for one month only from December 1, 2022) were $146.0 million, compared to $55.7 million in 2021.
- Pro Forma Consolidated Revenues for 2022 were $1.152 billion, compared to $921.5 million for the prior year, which after stripping out non-recurring mobile handset sales in 2021 of $301.0 million, represented an increase of 85.5%.
- ***Tingo Mobile's Handset Leasing Revenues for 2022 were $476.3 million, up 50.3% on 2021 revenues of $316.9 million.***
- ***Nwassa Agri Fintech platform revenues for 2022 were $532.2 million, up 168.0% on 2021 revenues of $198.6 million.***
- Operating loss of Tingo Group for 2022 (including Tingo Mobile for one month only from December 1, 2022) was $11.8 million, after accounting for non-recurring transaction expenses of $9.6 million and share based payments of $6.6 million, which if added back would result in an operating profit of $4.3 million, compared to a loss of $37.9 million for 2021.
- Pro Forma Consolidated Operating Income for 2022 was $554.6 million, compared to a loss of $47.0 million in 2021.
- Pro Forma Consolidated EBITDA[1] for 2022 was $954.5 million, compared to a Pro Forma Consolidated EBITDA[1] of $275.6 million for 2021.
- ***Tingo Mobile increased the customer numbers on its Nwassa Agri Fintech platform to 11.4 million at December 31, 2022, from 9.3 million at September 30, 2022, and handled more than $1 billion of customer transactions in the month of December.***

(Emphasis added.)

115.    In a section titled "Operational Milestones," the FY22 Press Release stated the following:

- Signed major trade partnership with the All-Farmers Association of Nigeria ("AFAN") on October 20, 2022, which launched ahead of schedule on November 16 2022, and ***includes commitment to enroll a minimum of 20 million new customers with Tingo Mobile.***

- Launched operations in Ghana on November 10, 2022, and signed a landmark trade deal with the Kingdom of Ashanti covering major agricultural and cocoa farming region, ***including a commitment to enroll a minimum of 2 million new customers with Tingo Mobile and a target to increase enrollments to more than 4 million.***

- ***Launched global commodity platform and export business on December 12, 2022, in partnership with the Dubai Multi Commodities Centre ("DMCC"),*** the world's no.1 free trade zone, with the aim of generating a substantial increase in sales demand for the crops produced by Tingo Mobile's farmers.

- Launched in Malawi on December 14, 2022, representing a sizeable market in its own right, and also constituting a strategically important base from which to expand into East Africa, including the neighboring countries of Tanzania, Zambia and Mozambique.

- Acquired 100% ownership of Tingo Foods Plc on February 9, 2023, a recently established food processing business with the capacity to offtake large volumes of raw crops from Tingo Mobile's farmers into finished food and beverage products. ***Since its inception in September 2022, Tingo Foods generated more than $400 million of highly profitable revenues during the four months ended December 31, 2022.***

- ***Tingo Foods, through a joint venture, has recently committed to fit-out and operate a $1.6 billion state of the art food processing facility in the Delta State of Nigeria, which is believed to be the largest of its kind on the African continent, and is expected to multiply the company's food processing capacity, as well as expand its range of food and beverage products.***

- ***Launched the TingoPay Super App and a pan-African partnership with Visa on February 14, 2023, which once fully rolled out will offer retail customers an integrated digital Visa card, together with payments services, an e-wallet, and a wide range of value-added services. TingoPay, with Visa, will also offer a full range of merchant services to businesses, including to Tingo Mobile's farmers.***

- Appointed specialist legal counsel and a team of expert advisors in February 2023 to investigate market manipulation and unlawful naked short selling of stock, and take appropriate action to prosecute any parties that have perpetrated illegal activity, and protect the Company from any such action in the future.

- A special dividend plan and share buyback program are being considered as possible means of increasing shareholder value and to address the significant disconnect between the Company's share price and its real value (in line with valuation multiples applied to other comparable Nasdaq listed companies).

(Emphasis added.)

116.    Included in the FY22 Press Release were the following statements from Defendant

Mercer:

"I am delighted with the remarkable transformation that we achieved in 2022. At the beginning of the year, we were faced with the backdrop of huge disruption in our domestic markets of China and Hong Kong, due to widespread Covid lockdown measures, and a significant downturn in the global financial services sector, in response to which we pivoted the Company both geographically and strategically, and acquired a business that is not only growing strongly but is also addressing

some of the world's biggest problems, namely food insecurity, financial exclusion and poverty. I feel privileged to be involved with Tingo and have acquired a business whose success is aligned with improving global food supply, and also with helping Africa and other emerging markets to become food sustainable.

"Our focus for much of 2022 was on completing and integrating our acquisition. After completing extensive due diligence and analysis on Tingo Mobile with a first-class team of globally renown advisors, including Ernst & Young, Dentons and Houlihan Lokey, before then restructuring the transaction so as to expedite its completion, and improve the terms for our shareholders, we were delighted to close the transaction to combine the companies before year end. *This has considerably strengthened our balance sheet at December 31, 2022, resulting in gross assets of $1.7 billion, of which more than $0.5 billion is cash on hand*. In addition, by closing the acquisition in 2022, we were able to engage one of the world's leading accounting and audit firms, Deloitte, to audit the combined December 31, 2022, balance sheet and financial statements. It also gave us the opportunity to engage Grant Thornton to undertake an audit and Sarbanes-Oxley review of the group's internal controls and procedures.

"I am also delighted with the progress we made with integrating Tingo Mobile into the group during Q4 2022, and in accelerating the expansion of the various businesses. *As announced previously, since November 2022 we have signed trade partnerships that are expected to triple Tingo Mobile's customers by the end of 2023, in addition to expanding our operations into three new countries, launching two new businesses, namely Tingo DMCC and TingoPay, and acquired the highly profitable Tingo Foods business. These significant developments, and their impact in terms of closing the end-to-end seed-to-sale ecosystem, puts us into a very strong position for 2023 and beyond.*

"The financial results for Tingo Mobile, and the pro forma consolidated financial information for the group, speak for themselves. *Highlights in the pro forma income statement include the 200% growth in gross profit in 2022 to $675 million, and a move from a Net Income Before Tax loss of $47 million in 2021 to a Net Income Before Tax surplus of more than $550 million in 2022.* Additionally, we have experienced material growth during the first quarter of 2023, and we expect such growth to continue and accelerate throughout the remainder of the year and beyond.

"Having successfully integrated Tingo Mobile into the group and completed an audit with a world leading accounting firm, we look forward to finally addressing the significant disconnect in our share price and attract a valuation that is reflective of our consolidated earnings. *With more than $500 million of cash on our balance sheet, and the launch of the largest food processing plant in Africa set to take place next year, we have an increasing number of options available to us to overcome the share price disconnect.* As we continue to evaluate and consider all the options, together with our overall strategy for maximizing shareholder value,

we will keep the market apprised and I hope to provide a further update in the coming weeks."

(Emphasis added.)

117. Included in the FY22 Press Release were the following statements from Defendant

Mmobuosi:

"My colleagues and I at Tingo Mobile and Tingo Foods are delighted that we are now part of Tingo Group. The completion of the merger on November 30, 2022, represented a major milestone in the history of Tingo Mobile, which my father and I founded some 22 years ago. We are already seeing the benefits of the synergies in the group, and of being part of a Nasdaq listed company, and our shareholders will have noted the considerable progress we have made since the fourth quarter of 2022, with the acceleration of our growth plans and globalization and dollarization strategies.

"We are particularly excited about the completion of the virtuous circle of our agri-fintech eco-system, where we can now deliver on, and profit from, every part of the journey from seed-to-sale. *We are also very excited about our diversification, both geographically, including within my home continent of Africa, as well as into other parts of the world and into other sectors, for example, through our B2C and B2B TingoPay business and partnership with Visa.*

"As we deliver on our success for the Company and its shareholders, it is of the highest importance to me and the Board of Tingo Group that we equally deliver on our mission and our Environment Social and Governance ("ESG") goals, as we continue to strive to meaningfully improve global food security and financial inclusion, and also to deliver social and financial upliftment to our customers and, very importantly to me, help make Africa food sustainable.

"With the major steps we have taken in recent months to capitalize on our merger and the Company's Nasdaq listing, we are confident we can build significantly on the revenue and earnings growth we achieved in 2022 and deliver considerable value to our shareholders."

(Emphasis added.)

118. In a section titled "2022 Financial Review," the FY22 Press Release stated the

following:

- *Net revenues for the year ended December 31, 2022, were $146.0 million, compared to $55.7 million in the prior year, an increase of 162%. The increase*

*is mainly attributable to the consolidation of Tingo Mobile from December 1, 2022.*

•      Gross profit for the full year 2022 was $64.8 million, or 44% of revenues, compared to $9.2 million, or 16% of revenues, in the prior year. ***The increase is mainly attributable to the consolidation of Tingo Mobile for the month of December,*** as well as to the growth in the margins of the Company's insurance agency business.

•      Selling & marketing expenses for the year ended December 31, 2022, were $11.1 million as compared to $6.8 million for the year ended December 31, 2021. The increase was due to the consolidation of such costs from Tingo Mobile for the month of December, and an increase in marketing expenses for the Company's insurance businesses, which is offset in part by a decrease in marketing expenses for the stock trading businesses.

•      General and administrative expenses were $58.2 million in the full year 2022, compared to $36.5 million in the full year 2021, which is mainly attributed to the consolidation of such costs from Tingo Mobile for the month of December. General and administrative expenses for the year included $9.6 million of non-recurring transaction expenses and share based payments totaling $6.6 million, representing a decrease in share-based payments of $4.7 million compared to the previous year.

•      Operating loss for the for the year ended December 31, 2022, was $11.8 million versus a loss of $37.9 million for the prior year. The decrease in loss from operations is mainly attributable to the consolidation of the profitable operations of Tingo Mobile for the month of December.

•      Net loss for the year ended December 31, 2022, was $47.1 million compared to $36.4 million for the year ended December 31, 2021, mainly as a result of an increase in tax expenses relating to the acquisition and consolidation of Tingo Mobile.

•      ***As of December 31, 2022, the Company's cash and cash equivalents on a consolidated basis was approximately $500.3 million, compared to $96.6 million at December 31, 2021. This reflects an increase of $403.7 million in cash and cash equivalents, which is attributable to the consolidation of Tingo Mobile's cash balance into the Company.***

(Emphasis added.)

119.     The statements made in ¶¶ 113-118 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations and

prospects. Specifically, Defendants failed to disclose to investors: (1) that Defendant Mmobuosi had lied about his biography and resume; (2) that Tingo photoshopped its logo onto pictures of airplanes the Company did not own; (3) that Tingo fabricated or inflated the margins on its food divisions; (4) that Tingo represented stock images as models of its planned Nigerian food processing facility and exaggerated the progress it had made on constructing the facility; (5) that Tingo overstated its food inventory; (6) that Tingo overstated its relationship with the farming cooperatives it claimed made up the majority of its Tingo Mobile subscribers; (7) that Tingo did not earn $128 million in revenue for its leasing, call and data segments as it had previously claimed; (8) that Tingo Mobile was delinquent on tax obligations in Nigeria; (9) that Tingo photoshopped its logo onto a competitors point of sale system website and claimed it as its own; (10) that Nwassa did not generate $125.3 million in revenue for Tingo; (11) that Tingo's agricultural export business was not set to hit $1.34 billion in exports by the third quarter of 2023; (12) that Tingo lacked adequate financial controls; and (13) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

120.    Also on March 31, 2023, the Company hosted an earnings call to discuss its 2022 Fiscal Year financial results with analysts and investors. During the call, Defendant Mmbuosi represented that "[i]n November and December, we signed trade agreements with two major partners with the aim of *quickly expanding Tingo Mobile's customer base from 9.3 million to an expected 30 million by the end of 2023*."

121.    The statement made in ¶ 120 above was false and misleading because: (1) the farming cooperatives that Tingo Mobile had claimed resulted in 9.3 million subscriptions had only resulted in a few hundred subscriptions, with many of the farming cooperatives denying having

ever heard of or worked with Tingo; and (2) due to the foregoing, Tingo Mobile did not have 9.3

million subscribers and, as such, did not "expect[] 30 million by the end of 2023."

*May 1, 2023 Form 8-K and Attached Presentation*

122.    On May 1, 2023, Defendant Mercer presented to investors at the Taglich Brothers

Investment Conference. Following the conference, the Company filed a Form 8-K with the slide

deck from the presentation attached. The slide deck stated that "[n]ew state-of-the-art $1.6 billion

food processing facility set to multiply capacity and revenue – scheduled to open mid-2024."

123.    The presentation also included a rendering of the proposed facility, pictured below.



124.    The statements made in ¶ 122 above were materially false and misleading because:

(1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its

2022 annual report; (2) Tingo had not begun preparing the food processing facility site for

operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023;

and (3) as a result of the foregoing, Tingo was not attempting to build its so-called "state-of-the-

art" food processing facility.

125.    The representation made in ¶ 123 above was also materially false and misleading

because the rendering of the facility which was included in the slide deck and attached to the Form

8-K was actually a stock photo of an oil refinery that was available for purchase online.

*May 1, 2023 Proxy Statement*

126.    On May 1, 2023, pursuant to Section 14(a) of the Exchange Act, the Company filed the 2023 Proxy Statement with the SEC, which contained various false and misleading statements and omissions. The 2023 Proxy Statement was solicited by Defendants Mercer, Benton, Scott, Brown, and Trippier and called for shareholders, *inter alia*, (1) to amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000; and (2) to approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the charter amendment and conversion proposal. Shareholders would not have approved the proposals had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

127.    With respect to risk oversight, the 2023 Proxy Statement stated the following:

The company board is responsible for overseeing the Combined Company's risk management process. The Combined Company Board focuses on the Combined Company's general risk management strategy, the most significant risks facing the Combined Company, and oversees the implementation of risk mitigation strategies by management. The Combined Company's audit committee will also responsible for discussing the Combined Company's policies with respect to risk assessment and risk management. The Combined Company Board believes its administration of its risk oversight function has not negatively affected the Combined Company Board's leadership structure.

128.    With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated the following:

The Combined Company has a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics is available on *www.tingogroup.com*. The Combined Company intends to make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its website rather than by filing a Current Report on Form 8-K. The information on any of the Combined Company's websites is deemed not to be incorporated in this proxy statement or to be part of this proxy statement.

129.    The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

130.    The 2023 Proxy Statement was also materially false and misleading because it failed to disclose that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

131.    As a result of Defendants Mercer, Benton, Scott, Brown, and Trippier causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, (1) to amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000; and (2) to approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock.

***May 15, 2023 Form 10-Q***

132.    On May 15, 2023, the Company filed a Form 10-Q with the SEC for the first fiscal quarter ended on March 31, 2023 (the "Q1 2023 10-Q), which Defendants Mercer and Chen signed. The Q1 2023 10-Q stated, "***Tingo Foods has also agreed to enter into a partnership with Evtec Energy Plc to build and operate our own food processing facility, which is expected to be completed by mid-2024***." (Emphasis added.)

133.    The statements made in ¶ 132 above were materially false and misleading because: (1) Tingo Foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) neither Tingo nor its purported joint venture partner had begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo's food processing facility was not "expected to be completed by mid-2024."

134.    The Q1 2023 10-Q also reported on Tingo Foods' financial results following its acquisition by Tingo on February 9, 2023. The Q1 2021 10-Q represented that, from February 9, 2023 to March 31, 2023, Tingo Food reported net revenue of $577,219,000. It also reported that Tingo foods' net profits during that same period were $143,445,000.

135.    The statements made in ¶ 134 above were materially false and misleading because Tingo Foods had not generated $577.2 million in revenue or $143.5 million in profits between February 9, 2023, and March 31, 2023. Indeed, during this 50-day period, Tingo did not own its own food processing facility and instead claimed to have outsourced production to unnamed third parties who own processing plants in Nigeria. Moreover, the Q1 2023 10-Q did not report that Tingo Foods had any inventory and, as a result, Tingo's financial reports contained a variety of errors begging the question as to whether the Company had any financial controls.

136.    The Q1 2023 10-Q also reported that the Company had $780,153,000 in cash and cash equivalents, further noting that "***the majority of the cash is held at its bank in Nigeria***, and there are certain foreign exchange restrictions in place that limit the conversion of such cash into US Dollars and other currencies." (Emphasis added.)

137.    The statements made in ¶ 136 above were materially false and misleading because, based on Tingo's financial statements, it would be impossible for the Company to have over $780 million in cash. Indeed, as the Hindenburg Report reveals, if Tingo's cash claims were true, its interest income for the first quarter of 2023 would have been approximately $12 million using Nigeria's market interest rate of 8% for deposits. And yet, Tingo reported just $1,444,000 in financial income for the first quarter of 2023, thereby indicating that the Company did not have over $780 million in cash as of the date the Q1 2023 10-Q was filed.

### *May 15, 2023 Form 8-K*

138.    Also on May 15, 2023, the Company filed a Form 8-K with the SEC to announce its quarterly earnings, which Defendant Mercer signed. Attached to the 8-K was a press release titled "Tingo Group, Inc. Reports First Quarter 2023 Financial Results." The press release, stated in relevant part:

> Tingo Foods, together with its joint venture construction partner on the new state-of-the-art $1.6 billion food processing facility, celebrated the breaking of ground with a foundation laying ceremony attended by various representatives of local government and Nigeria's Ministry of Agriculture. ***Since then, significant progress has been made on the construction of the facility including the installation of infrastructure, drainage, water supply and the foundations of its numerous buildings. With construction work progressing as scheduled,*** the new food processing facility, to be operated exclusively by Tingo Foods is on timetable and anticipated to open by mid-2024.

(Emphasis added.)

### *May 15, 2023 Earnings Conference Call*

139.    Later on May 15, 2023, Tingo held an earnings conference call with investors to discuss the first quarter financial results for 2023. During that call, Defendant Mmobuosi stated that "Tingo Foods is set to multiply capacity and revenue with a new state-of-the-art $1.6 billion food processing facility in Delta State of Nigeria. ***Our joint venture partner is already at an advanced stage of completing work on the building's foundations and the installation of infrastructure, drainage, and water supply and facility is on track to open by mid-2024.***" (Emphasis added.)

140.    The statements made in ¶¶ 138-139 above were materially false and misleading because: (1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) neither Tingo nor its purported joint venture partner had begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo's food processing facility was not "expected to be completed by mid-2024."

141.    Defendant Mmobuosi further stated on the call that "***Within the first four months of trading to December 31, 2022, Tingo Foods generated more than $466.2 million of turnover. The first quarter of 2023 then saw revenues grew to $577.2 million, generating an operating profit of USD143.5 million***." (Emphasis added.)

142.    The statements made in ¶ 141 above were false and misleading because Tingo Foods had not generated $577.2 million in revenue or $143.5 million in profits between February 9, 2023, and March 31, 2023. Indeed, during this 50-day period, Tingo did not own its own food processing facility and instead claimed to have outsourced production to unnamed third parties who own processing plants in Nigeria.

143.    Also during the call, Defendant Chen reported "Nwassa platform revenues of $125.3 million" for the first quarter of 2023. This figure was also listed in the slide deck which accompanied the call.

144.    The statements made in ¶ 143 above were false and misleading because the Nwassa platform does not function. Indeed, the Hindenburg Report revealed that Nwassa's website had been under maintenance for months. Similarly, Hindenburg looked at archives of the platform which show that the platform was never fully developed. Instead, it only listed a few products— none of which had any reviews or ratings. Thus, the revenue numbers are false and misleading because Nwassa being out of operation means that the platform could not have processed the transactions during the time those statements were made.

### *May 30, 2023 Press Release*

145.    On May 30, 2023, the Company issued a press release which announced that Tingo DMCC "has completed its first batch of export deals, generating $348 million of sales with a gross profit approaching $100 million." The press release further represented that "[t]he sales completed today are part of an anticipated long-term multi-billion-dollar pipeline of export transactions, *more than $1 billion of which are currently being processed for expected delivery by the third quarter of 2023*." (Emphasis added.)

146.    The statements made in ¶ 145 above were false and misleading because Tingo had either fabricated or inflated the export data it reported. The Hindenburg Report revealed that Nigerian customs data has no records of either Tingo or Tingo DMCC exports, yet Tingo claims to have exported over $348 million. Furthermore, Tingo claims to process more than $1 billion in export transactions, yet Nigeria's entire total agricultural exports in 2022 were $1.15 billion.

Finally, Tingo DMCC's website is dysfunctional, providing no ability to live trade or create a trading account, and contains numerous dead links and fake testimonials

**The Truth Emerges**

147.    On June 6, 2023, Wall Street short seller Hindenburg issued a report titled "Tingo Group: Fake Farmers, Phones, and Financials —The Nigerian Empire That Isn't," alleging that Tingo had fabricated its business operations and financials. According to the Hindenburg Report, Tingo made false statements about the success of various subsidiaries, including Tingo Foods, Tingo Mobile, Nwassa, and Tingo DMCC.

148.    The Hindenburg Report began by describing the Company and the Hindenburg Report's findings, stating:

- We are short Tingo Group Inc (NASDAQ: TIO) because we believe the company is an exceptionally obvious scam with completely fabricated financials.
- Tingo, headquartered in New Jersey, claims to have several business segments focused on providing mobile phones, food processing and an online food marketplace for farmers primarily located in Nigeria.

149.    Regarding Defendant Mmobuosi's fabricated biography, the Hindenburg Report stated, in relevant part:

- Tingo was founded and is spearheaded by "Dozy" Mmobuosi, CEO of the key holding company entity. Dozy is regularly described by the media as a billionaire and made waves earlier this year when he attempted to acquire the now-Premier League soccer team Sheffield United.
- We've identified major red flags with Dozy's background. For starters, he appears to have fabricated his biographical claim to have developed the first mobile payment app in Nigeria. We contacted the app's actual creator, who called Dozy's claims "a pure lie".
- Dozy claimed to have received a PhD in rural advancement from a Malaysian university in 2007. We contacted the school to verify the degree. They wrote back saying no one by his name was found in their verification system.
- In 2017, Dozy was arrested and faced an 8-count indictment over issuance of bad checks, according to the Nigerian Economic and Financial Crimes Commission. He later settled the case in arbitration.
- In 2019, Dozy claimed to have launched "Tingo Airlines" and posted social media messages encouraging customers to "fly with Tingo Airlines today". Media

outlets later uncovered that Tingo had photoshopped its logo onto pictures of airplanes. Dozy later admitted to never owning any actual aircraft.

150.     The Hindenburg Report also pointed out that in April 2023, Christophe Charlie, the

co-chairman of the subsidiary Tingo Inc., filed a public letter with the SEC addressed to Dozy,

stating:

> I have made numerous efforts to implement best corporate governance practices and have always been guided by the best interests of Tingo Inc's shareholders. ***Despite my efforts there remains a lack of communication and teamwork in the management of the company, and many critical questions, comments and recommendations which I have sent to management and the Board have once again remained unanswered and unheeded.*** As a result, I will not be in a position to approve the 10K for 2022 prepared by management and feel it necessary to recuse myself by resigning from the Board.

(Emphasis added.)

151.     Regarding Tingo foods' financials, the Hindenburg Report revealed overinflated

financials, stating in relevant part:

> •      Tingo's food division is 7 months old yet claimed to generate $577.2 million in revenue last quarter alone, representing 68% of total reported revenue. If accurate, its claimed 24.8% operating margins would exceed those of every major comparable food company.
> •      Yet, Tingo has no food processing facility of its own. Rather, it claims its explosive revenue and profitability is derived from acting as a middleman between Nigerian farmers and an unnamed third-party food processor.

152.     Regarding Tingo's claim it had begun to develop the $1.6 billion state-of-the-art

food processing center, the Hindenburg Report revealed that no progress had even begun, stating:

> •      In February 2023, the company held a groundbreaking ceremony for a planned $1.6 billion Nigerian food processing facility of its own, attended by the country's agriculture minister and other political luminaries.
> •      We found that the rendering of the planned facility, featured in Tingo's investor materials and on a billboard at the ceremony, is actually a rendering of an oil refinery from a stock photo website.
> •      Following its groundbreaking, Tingo reported in a May 2023 SEC filing that it made "significant progress" on the facility, including laying "the foundations of its numerous buildings".

- We visited the site a week later and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds.
- Subsequent to the "groundbreaking", Tingo announced a $150 million agreement with a UK entity called Evtec Energy to build solar panels for its non-existent food processing facility. Funding for the deal is slated to be provided through Evtec, but UK filings show that Evtec was "Dormant" as of its most recent annual report and held zero cash in the bank.
- Tingo Group bought Tingo Foods from Dozy in February 2023 for $204 million, a price "approximately equal to the cost value of the inventory held by Tingo Foods".
- The inventory, which was reported in year-end financials, completely vanished from Tingo's Q1 2023 accounts without explanation. In our experience, $204 million in inventory doesn't just disappear at companies with adequate internal controls and genuine financial reporting.

153.    Regarding the Company's claims that Tingo Mobile was a financial success, the

Hindenburg Report revealed the following:

- Tingo claimed in its reverse merger press release that members of 2 unnamed farming cooperatives supply the majority of its then-9.3 million userbase, consisting of local Nigerian farmers. These farmers supposedly form the core of the company's phone customers and provide the agricultural products used in Tingo's food processing and trading businesses.
- A local media outlet identified and contacted the cooperatives. Both said they had never heard of Tingo and had fewer than 100 farmers in each cooperative.
- We were able to make contact with one of the cooperatives. Its owner reiterated having no relationship with Tingo and flat out told us "they are scammers."
- Tingo claimed its mobile handset leasing, call and data segments generated $128 million in revenue last quarter (~15% of total), claiming these services are provided through an agreement with Airtel in Nigeria. The type of license they claim did not exist until June 2023.
- Our checks with the Nigerian Communications Commission showed it has no record of Tingo being a mobile licensee at all, despite company claims of having 12 million mobile customers.
- Despite claiming to have millions of farmers using its phones, Tingo Mobile's corporate presentation and webpage uses stock photos of farmers using phones.
- We visited Tingo Mobile's office in Nigeria and found only a handful of employees and a sign posted on its door by federal tax authorities stating that the company is delinquent on its tax obligations.
- Tingo Mobile claimed a Ghana expansion effort would enroll 2-4 million members by February 2023. This would represent ~9%-18% market share in the

country within months of launch. We found zero records pertaining to Tingo Mobile through Ghana's communication regulator.

- We tried to contact Tingo's Ghana support in late May to buy a phone. The email bounced back and no one picked up the phone despite numerous attempts.
- We visited Tingo's Ghana office location in late May 2023. We saw 2 cars in the parking lot and no customers. When we tried to enroll in a plan and buy a phone we were told the location wasn't operational yet.

154.    Regarding the Company's claims it had a deal with Visa, the Hindenburg Report revealed the following:

- TingoPay (part of Tingo Mobile) claimed in 2021 to have launched a partnership with a major local bank.
- Two days after Tingo's blockbuster announcement, the bank put out a statement calling Tingo's claim false and that it had "NOT concluded any agreement with Tingo International in respect of any payment system whatsoever."

155.    Regarding the Company's claim that Nwassa was successful, the Hindenburg Report revealed the following:

- Tingo now claims its payment group has a point of sale (PoS) system and other merchant products. We found that pictures of Tingo's claimed PoS system were taken from a different PoS operator's website, with a Tingo logo photoshopped over them.
- Tingo claims its "seed to sale" online marketplace called NWASSA generated $125.3 million in revenue last quarter or ~15% of its total revenue, yet the website has been "under maintenance" and inoperable for months.
- Tingo claims it has launched its NWASSA platform in Ghana. The Ghana website also doesn't work and just says "Updating…" without ever going anywhere.

156.    Regarding the Company's claim that Tingo DMCC was a thriving export business, the Hindenburg Report revealed that its financials were fabricated, stating:

- In a May 2023 press release, Tingo claimed its brand-new agricultural export business, Tingo DMCC, was on track to deliver over U.S. $1.34 billion in exports by Q3.
- Tingo's sales projections for that business are higher than the entire nation of Nigeria's annual 2022 agricultural exports, which totaled about U.S. $1.15 billion, per government data.
- Despite Tingo's bold claims, we found no import/export records from Tingo at all through searches of Nigerian customs and trading databases.

- Tingo DMCC's website has numerous non-functioning links and includes a fake testimonial that appears leftover from the website template.

157.    Regarding the financial controls and quality of the Company's financial reporting, the Hindenburg Report revealed that its public disclosures were littered with errors, stating the following:

- Tingo's financial statements are riddled with errors and typos, including a note to itself that it apparently forgot to delete, saying "please update for the tingle (sic) transaction including the tingle (sic) foods transaction".
- Its financials include other basic errors like incorrect math and leaving zeroes off key metrics.
- More troublingly, Tingo's cash flow and balance sheet statements do not reconcile and show major errors indicating a complete lack of financial controls. Its cash flow statements regularly subtract items from cash that should be added and vice versa.
- The errors also seem to apply to Tingo's audited annual financial statements, which were recently given an unqualified audit opinion by Deloitte Israel (a strange choice given the company lacks substantive operations in Israel).
- We strongly suspect Tingo's cash balance, which it conveniently claims is held in Nigeria, is fake. The company collected only ~12% of the interest income one would expect from its claimed cash balances.

158.    Following the allegations, the Hindenburg Report left a scathing conclusion against Tingo, stating "***Tingo is a worthless and brazen fraud that should serve as a humiliating embarrassment for all involved. We do not expect the company will be long for this world***." (Emphasis added.)

159.    On this news, Tingo's stock price fell from a closing price of $2.55 per share on June 5, 2023, to a closing price of $1.32 per share on June 6, 2023.

## Subsequent Developments Following the Relevant Period

160.    Following the revelations of the Hindenburg Report, the Company was slow to publicly respond to the allegations.

161.    On June 6, 2023, the Company published a press release "refuting" the allegations in the Hindenburg Report, in which it stated that the report contained "numerous errors of fact" and was "misleading and libelous."

162.    Two days later, on June 8, 2023, the Company appointed outside counsel from White & Case LLP to "conduct an independent review reporting to its independent directors concerning allegations contained in" the Hindenburg Report.

163.    On August 9, 2023, the Company announced it was rescheduling its Second Quarter 2023 Results Conference Call and its 10-Q filing. The Company delayed filing its second quarter 2023 10-Q two more times until it finally filed the 10-Q on August 31, 2023.

### *August 31, 2023 Hindenburg Updated Allegations*

164.    On August 31, 2023, Hindenburg published an update (the "Hindenburg Update") on its allegations against Tingo. It noted that Tingo failed to mention any continuing relationship with White & Case LLP after publicly announcing the relationship on June 8, 2023. Instead, Tingo's investigation was now "based on the Company's outside counsel's investigation and further investigative work of its own." White & Case LLP reportedly ended its relationship with Tingo back in July, which the Company failed to and continues to fail to disclose to investors.

165.    Additionally, the Hindenburg Update noted that Tingo failed to name which bank reviewed the Company's errant financial statements and holds the Company's alleged $780 million cash balance.

166.    Likewise, the Hindenburg Update noted that the Company's 10-Q for the second quarter of 2023 revealed the Company's reported cash had "dropped by a stunning $725 million over the course of one quarter."

167.    On this news, the Company's stock price dropped from a closing price of $1.40 per share on August 30, 2023 to a closing price of $1.29 per share on August 31, 2023. The Company's stock price continued to drop over the next week and sank following further allegations from Hindenburg on September 5, 2023. By September 7, 2023, the Company's stock price had dropped to $1.09 per share at the closing of trade. This represented a drop of $0.31 per share or 22% in lost value.

### *September 18, 2023 Board Changes*

168.    On September 18, 2023, Tingo announced a number of changes to its Board and executive leadership. Notably, the Company announced that Defendant Mercer stepped down as CEO, and Defendants Mmobuosi and Denos were appointed as Interim co-CEOs. Additionally, Defendant Benton stepped down as a member of the Board and Chair of the Audit Committee. Defendant Benton was replaced by relevant non-party Khurshid.

## DAMAGES TO TINGO

169.    As a direct and proximate result of the Individual Defendants' conduct, Tingo has lost and will continue to lose and expend many millions of dollars.

170.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

171.    As a direct and proximate result of the Individual Defendants' conduct, Tingo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

172.    Plaintiff brings this action derivatively and for the benefit of Tingo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tingo, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) Exchange Act and the aiding and abetting thereof.

173.    Tingo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

174.    Plaintiff is, and has been at all relevant times, a shareholder of Tingo. Plaintiff will adequately and fairly represent the interests of Tingo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

175.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

176.    A pre-suit demand on the Board of Tingo is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following five individuals: Defendants Brown, Denos, Scott, and Trippier (the "Director Defendants"), along with non-party Khurshid (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time of the filing of this complaint.

177.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

178.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

179.   Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since December 2022. He has also served as a director of TMNA, the previous parent company of Tingo Mobile, since September 2021. As a trusted director of the Company, Defendant Brown conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brown signed the 2022 Form 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. For these reasons, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.     Additional reasons that demand on Defendant Denos is futile follow. Defendant Denos currently serves as interim co-CEO of the Company and has served as a Company director since November 2022. Additionally, Defendant Denos served as Executive Vice President, General Counsel, and Corporate Secretary of TMNA, the previous parent company of Tingo Mobile. Thus, the Company provides Defendant Denos with his principal occupation and, as the Company admits, he is a non-independent director. Defendant Denos has received and continues to receive compensation for his role as Company director and interim co-CEO. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Denos signed the 2022 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Denos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.     Additional reasons that demand on Defendant Scott is futile follow. Defendant Scott has served as a Company director since November 2019. Defendant Scott also serves as Chairman of the Board, Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and a member of the Audit Committee. Additionally, Defendant Scott has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director and the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Likewise, the Company lists Defendant Scott as a "financial expert," yet under his watch and expertise, the Company published incorrect and errant financial statements and accounting figures. Furthermore, Defendant Scott signed the 2022 Form 10-K and solicited the 2022 and 2023 Proxy Statements, all of which contained false and misleading statements. The false and misleading 2022 Proxy Statement also resulted in shareholders voting to reelect Defendant Scott to the Board. For these reasons, Defendant Scott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Trippier is futile follow. Defendant Trippier has served as a Company director since May 17, 2022. Defendant Trippier also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. Additionally, Defendant Trippier has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Trippier signed the 2022 Form 10-K and solicited the 2022 and 2023 Proxy Statements, all of which contained false and misleading statements. The false and misleading 2022 Proxy Statement also resulted in shareholders voting to reelect Defendant Trippier to the Board. For these reasons, Defendant Trippier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on the Board is futile follow.

184.    Additional reasons that demand on Defendants Denos and Brown is futile follow. Defendants Denos and Brown were made Company directors pursuant to the Company's merger agreement with TMNA, which Defendant Mmobuosi was the CEO of. TMNA holds 20% of the shares of Tingo. Pursuant the merger agreement, TMNA was authorized to appoint two directors to Tingo's Board, who turned out to be Defendants Denos and Brown. The majority of the materially false statements and omissions alleged herein were directly link to now interim co-CEO Defendant Mmobuosi, who appointed them both to the Board. Since Defendants Denos and Brown serve the Board pursuant to their appointment by Defendant Mmobuosi, they are beholden to him. Because taking action against the Individual Defendants would potentially harm the financial interests of Defendant Mmobuosi, whom Defendants Denos and Brown are beholden to, demand is futile against Defendants Denos and Brown.

185.    Demand on Defendants Denos, Trippier, Scott, and Brown is also futile because they will benefit in the future from the Individual Defendants' solicitation of the 2022 Proxy Statement which called for shareholder approval of the Plan Proposal. The Plan Proposal called for a shareholder vote to increase the number of shares to be issued pursuant to the Plan by 5,000,000, thereby allowing the Individual Defendants to continue to be able to receive payments under the Plan in the future. Shareholders would not have approved the Plan Proposal had they known the true state of affairs at the Company. As a result, Defendants Denos, Trippier, Scott, and Brown cannot be presumed to be disinterested in taking action against those who solicited the materially false and misleading 2022 Proxy Statement (i.e. Defendants Mercer, Benton, Scott, and Trippier). As such, demand upon Defendants Denos, Trippier, Scott, and Brown is futile and, therefore, excused.

186.    Defendants Scott and Trippier served as members of the Compensation Committee (the "Compensation Committee Directors") during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan Proposal, which granted them the right to continue to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit in the future from shareholder approval of the Plan Proposal, which allowed for more Company shares to be issued to officers and directors pursuant to the Plan and which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements. Thus, non-employee directors Brown and Denos are beholden to the Compensation Committee Directors, and the Compensation Committee Directors are beholden to each other, because they would not take action against the very directors who hold the authority to award them high compensation pursuant to the Plan. These conflicts of interest preclude the Compensation Committee Directors and the rest of the Director Defendants from calling into question the Director Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

187.    Moreover, Defendants Scott and Trippier served as members of the Audit Committee during the Relevant Period. In violation of the Audit and Risk Committee Charter, the Defendants Scott and Trippier failed to adequately review and discuss the Company's Forms 10-K; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Scott and Trippier further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

188.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

189.    Tingo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Tingo any part of the damages Tingo suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

190.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising

independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

191.    The acts complained of herein constitute violations of fiduciary duties owed by Tingo's officers and directors, and these acts are incapable of ratification.

192.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tingo. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Tingo, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

193.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Tingo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

194.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

197.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

198.    Under the direction and watch of Defendants Mercer, Benton, Scott, and Trippier, the 2022 Proxy Statement failed to disclose that the Company's new subsidiaries were not achieving the level of success that had been purported. The 2022 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such

65

as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

199. Defendants Mercer, Benton, Scott, and Trippier knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

200. The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) re-elect Defendants Mercer, Benton, Scott, and Trippier to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve an additional 5,000,000 shares of common stock for issuance under the Plan.

201. Under the direction and watch of Defendants Mercer, Benton, Scott, Brown, and Trippier, the 2023 Proxy Statement failed to disclose that the Company's new subsidiaries were not achieving the level of success that had been purported. The 2023 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually

exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

202.    Defendants Mercer, Benton, Scott, Brown, and Trippier knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement. The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia*, (1) amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000 and (2) approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock.

203.    The Company was damaged as a result of Defendants Mercer, Benton, Scott, and Trippier's material misrepresentations and omissions in the 2022 Proxy Statement.

204.    The Company was damaged as a result of Defendants Mercer, Benton, Scott, Brown, and Trippier's material misrepresentations and omissions in the 2023 Proxy Statement.

205.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tingo's business and affairs.

208.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tingo.

210.     In breach of their fiduciary duties owed to Tingo, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

211.     The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

212.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

213.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tingo's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

214.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tingo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tingo.

219.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Tingo that was tied to the performance or artificially inflated valuation of Tingo, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

220.    Plaintiff, as a shareholder and a representative of Tingo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

221.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Abuse of Control**

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tingo, for which they are legally responsible.

224.    As a direct and proximate result of the Individual Defendants' abuse of control, Tingo has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tingo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

225.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

226.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tingo in a manner consistent with the operations of a publicly held corporation.

228.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tingo has sustained and will continue to sustain significant damages.

229.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

230.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

233.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Tingo to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

234.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

235.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Tingo, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Tingo;

(c)     Determining and awarding to Tingo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Tingo and the Individual Defendants to take all necessary actions to reform and improve Tingo's corporate governance and internal procedures to comply with applicable laws and to protect Tingo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Tingo to nominate at least three candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Tingo restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2023

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth J. Donohoe*
Elizabeth J. Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

eitank@bgandg.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Al Rago, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

26       I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of September, 2023.

DocuSigned by:

5939593C451C4D6...

Al Rago